We'll hear argument next this morning in Case No. 11-597, Arkansas Game and Fish Comm'n v. United States. Mr. Goodhart. Mr. Chief Justice, and may it please the Court, the issue is whether temporary flooding can ever constitute a taking under the Fifth Amendment. The Federal Circuit said no, never, ruling that the permanent consequences of the government's actions were not relevant solely because its actions were not permanent. Respectfully, Your Honors, that cannot be the rule. There are at least two reasons why. First, the United States must provide just compensation when its direct physical invasion substantially intrudes upon a landowner's protected property interest, regardless of the particular mode or duration of that invasion. And second, the Federal Circuit's decision conflicts with fundamental guarantees that the takings clause is intended to preserve and therefore is manifestly unjust. What about this Court's precedent in, what is it, Sanguinetti case, where the Court said that for there to be government responsibility, it is at least necessary that the overflow constitute a permanent invasion of the land, amounting to an appropriation, not merely an injury to property. We would have to withdraw or modify that statement, would we not, if your argument prevails? Justice Ginsburg, we would say that you would not have to overrule Sanguinetti because the language there, permanent flooding invasion, was not how the case turned on the result. The Court there did make an inaccurate summary of the early flood-taking cases, Pumpley, Leina, and Kress. None of those cases said that flooding had to be permanent. The facts in those cases did have permanent condition of flooding, but that was not made a requirement. And none of those cases said that you could not have temporary flood invasions. But, Your Honor, was Sanguinetti – had we had any temporary takings cases before Sanguinetti? Justice Scalia. In other words, was Sanguinetti expressing a special rule for flooding, or was it simply saying there can't be a temporary taking? If the latter, that dictum, if it's dictum or a holding, if it was a holding, has already been overruled by our later temporary takings cases. Justice Scalia, there – you're correct. There was no temporary takings prior to Sanguinetti. The Court there didn't have occasion to address temporary flooding and whether that could constitute a taking. And all of the cases after Sanguinetti that have actually addressed whether a direct temporary invasion will – that substantially intrudes upon property interests have held that, yes, you can have a temporary invasion. Breyer. Which ones? Because I counted 11 cases which either say, state, some seem to hold or support the proposition that when it's temporary with a flood, it's a trespass, and where it's permanent, it's a taking. Okay? I mean, I have 11. And so I got from my law clerk, and then I tried to say, well, what are the ones that say the opposite? And so far, we've come up with zero. All right? Xenia, you could argue, though, there were three cases during the war which might be read that way, though they don't quite mention it. All right. So which of the cases that you – rather than list my 11, I'm more interested in what you think. And so I'd like to know which of the ones you think support with something like a flood, which it's not – you're not physically taking a hold of the whole thing. You're sending something in that comes back. Which of the ones support you that temporary is not a trespass, temporary is a taking? Justice Breyer, in the Dickinson case in 1947, where the Court found a taking from flooding, Mr. Dickinson reclaimed his property, effectively reclaimed most of the property that had flooded, effectively ending the flood invasion. And the Court there said the taking was a taking when that occurred, regardless of whether the landowner does reclamation. Of course, this Court, in the war seizure cases, in General Motors, Petty Motor, Pee Wee Coal, Kimball Laundry, all of those cases, the Court has found – Dickinson, I've got it written down, Dickinson. Yes, Your Honor. Kimball Laundry. Kimball Laundry was the laundry facilities. Yes, Your Honor. They took the laundry facilities for three years, but there what they did is they went and they took this building. You know, so the whole thing. Yes, Your Honor. The problem with a flood is you don't take all the land. You send some stuff in. And it's the stuff is there for a while, then it comes back, and it's cold water. And so I don't know what to make of the cases like Kimball Laundry where you actually appropriate the property. I suspect that there's – they're not quite the same. Anything else? I've got Dickinson, I've got Kimball Laundry. Scalia, do we have cases about flying over land? Cases about shooting, shooting over land, right? Yes, Your Honor. The Cosby case. It's not water, but it ain't taking either in the narrow sense that Justice Breyer has talked about. Yes, Your Honor. The United States flooded the air over the Cosby's residence and commercial chicken farm. Cosby, what they did, there's a question about whether just flying some airplanes over is a taking or a trespass. But it went on for 25 years, or it's a long time, and therefore the permanency of it I don't think is at issue there. Yes. Your Honor, in this case, the Court of Federal Claims found that these deviations resulted in over 8 years, 6 consecutive years of recurring flood invasions during the summertime, during unnatural time periods, and that the facts were more consistent with the overflights or in Portsmouth Harbor with cannon shots flooding the air over Portsmouth Land and Harbor Hotel. These flood invasions happened each year for specific sustained time periods. The United States controlled the timing, the frequency, and the extent of the duration of these floods. What if it hadn't harmed the timber? I mean, you know, the damages claimed are a lot of the timber that would have been valuable was impaired by these floodings. Suppose there had been no harm at all. Suppose there had just been, for a certain period of time, you were not able to use that land for anything. You couldn't plant anything on it, you couldn't picnic on it, you couldn't do anything. Would that have been nonetheless, despite the fact that there was no harm done except the flooding, would that have been a taking? Your Honor, no. There would not have been a taking unless the landowner could show substantial intrusion upon his protected property. Scalia, Well, he has. It's flooded. He can't. He can't. If, Your Honor, if he can show that the he has the right to exclude superinduced invasions of water, so that it doesn't interfere with his use and enjoyment. Here. Scalia, It does. He can't plow on it, he can't picnic on it. How does that not interfere with his use of the land? Well, in a very way, well, Your Honor, and here that doesn't. Scalia, It would be a taking. Are you saying yes or no? What is it? I'm saying yes if he can show that it intruded on his use and enjoyment. And as you said, indicated, that type of interference, yes, it would be, it would be a substantial intrusion on his rights. So that would, that would cover a one-time flood. Not necessarily, Justice Ginsburg. A one-time flood that is extensive, it could kill all the trees on this management area in one flood. However, one flood may not result substantial intrusion on protected property rights. So it's going to depend on the facts, Your Honor. I don't, I don't understand that. You said if the, if it's one flood, even though it destroys the trees and certainly wouldn't, not make it, would make it impossible to have picnics. Well. So if that's your position, then you're turning on it happened six times, not once. Is that? In Your Honor, what I'm saying, it's a proof of facts. The physical takings analysis is the same. The legal analysis is the same. But one flood could effectively destroy timber if it is a lake, if it sits there. We didn't have that in our case. We had intrusion during 1993 to 2000, 8 years, 6 of which were substantially throughout the summer, where this management area sat in water during June, July into August, basically stagnated water that choked the oxygen from the roots of these trees. And in 1999, it was termed a brownout. It was massive. Once the timber inventory was done, it revealed that there was over 100,000 trees in a 6,990-acre area that were either destroyed or were in the process of dying. And that didn't include the other 11,000 acres that we subsequently inventoried. Sotomayor, all of our cases, and this temporary versus permanent, as I read the cases and I read what the multiple facts that each are relying on, it seems to me that our cases have been attempting in the term temporary to encompass a lot of different concepts, both intentionality, because an accidental issue is not a taking, causation. Did this, and that's part of Sangretti's holding, did what the government do actually and directly cause the injury at issue, and foreseeability. And they're using that in a multifaceted test, one that the Solicitor General is not trying to endorse here, but one that I think is more consistent with our general jurisprudence in this area. So there's never a simple answer on the question of permanent damage, because you can have permanent damage that's not a taking. Sotomayor, I think if all of the other factors I've just mentioned are not in your favor, is that correct? Yes, Your Honor, you're correct. The invasion has to be direct by the United States. The Court, Federal claims found that it was direct, natural, and probable, the results were, from the government's action. One thing in water cases is you don't have dye in the water. Mr. Cosby could look up and see the insignia on the airplanes, and we knew that the cannon fire from the artillery was coming over the Portsmouth Harbor's land was from the government. The water, you can't always tell, and so you have to prove that that was directly from the United States. And the commission in this case did. I guess the problem with this case, and it's part of what's interwoven in your adversary's arguments, is that with flooding, it's going to occur naturally anyway. The government generally builds dams to control that flooding to the benefit of all of the interests along its affected route. And at some point, either the government is going to make a decision that's going to help someone and potentially hurt someone, and the question is, is in all of those situations going to be subject to litigation? The government's rule, I call it the government's rule, but it's your other, is basically simple. It can't, because if the deviation is temporary, and that's what the circuit below said, it's just exercise. It's either a nuisance or a temporary trespass, and we're not going to hold the government's rule responsible for that loss, assuming it's going to occur in part because flooding's always going to occur. The question is perhaps when. But in any place you have a dam, it's there because flooding was happening. Isn't that the basic argument? And I don't know that you've actually announced a rule that addresses the essence of the policy considerations that are driving the government decision. So tell me how your rule makes this a manageable situation. Your Honor, the two elements of the rule, that there must be direct physical invasion by the United States and not from some other cause, and there must be substantial intrusion upon these protected property rights, the right to exclude, the right to use and enjoy, and the right to dispose. But that's every flood. That runs throughout this Court's case. But that's every flood. Yes, Your Honor, it is. But the United States, when it does control the property rights, it's not a problem. No, no, no, I don't – why is that every flood? You go through your three factors, it could have lots of floods that aren't a substantial intrusion. You know, you get an extra inch of water, and then it recedes. And it's, you know, you get a note from the Corps of Engineers saying, we're sorry, it won't happen again. That's not – every flood is not. You're correct, Mr. Chief Justice. Every flood is certainly not rising to the level of a taking. I guess what we're asking you is, how do you define the baseline of protected expectations for the property? Your Honor, you've indicated, I think, in your brief that one year won't do it. This was six or seven years. If that's a baseline of expectations, the government cannot change that even if it thinks that there is a higher and more urgent priority in protecting some other land. Your Honor, the – certainly the government is not the insurer of flood control, how they just carry it out. There's the case that's cited in the government's brief, United States v. Sponenbarger, which says that very thing. The United States is not the insurer of it. But when it takes water and it controls water and releases it in a manner that's not from storms, not from natural, but does it in a manner that they control how it's released and the duration, frequency, and they use property to store that water for 8 – you know, over 8 years, that in this case was – was compelling and the Court found that those facts. So my question is, how do you define the baseline that gives a legitimate expectation if the Corps of Engineers, it did not happen in this case, but in a hypothetical case, makes the finding that there is a more urgent and a higher priority for other lands and it changes its policy? It cannot do that? Your Honor, it can go through its law, the National Environmental Policy Act, the Clean Water Act, but it can't make that change without being paid for what it's going to take from private landowners. Well, what you're saying is that it can't make that change without paying, right? It cannot make that change where it's going to burden the landowner and interfere with that – those property rights that the Fifth Amendment is guaranteeing. Now, in practice – Now, suppose at the very outset of the dam, the government said we've got to put this Your Honor. If the land was always flooded anyway on the right. That may not be a taking. And, for example, in the Bedford case in 1904, where a revetment was in the Mississippi River, it was trying to control natural erosion from a cutoff that had been created, the landowner could not show. Well, I want the definition of the operable baseline that we can use in order to define whether or not there's been a taking. And, Your Honor, I guess I must say it may not be a bright line. It is the analysis here that this Court has used throughout its physical takings cases will separate the torts from the takings. And here, again, the United States – this has worked well in other cases for the United States where in Sanguinetti, there was no – Should the baseline be what would have happened if the dam was never built? Perhaps, Your Honor. And in this case, for example, the Court had evidence that this land flourished before the dam. There was evidence that this bottomland hardwood forest existed for generations. And when the control plan was put into effect in 1953, it worked fine because they mimicked natural flow where late winter and early spring, you have your releases, they dissipate, the water recedes, but you don't have extensive summertime flooding from a river, frankly, anywhere in the country, but certainly not in the southern part of the United States. These rivers do not overflow during June, July, August. This had never happened. Breyer. What do you suggest? I looked at Dickinson. Yes, Your Honor. To tell you the truth, I think it's permanent. I think they're thinking it's intermittent, but permanently intermittent. Yes, Your Honor. The flood comes like three months a year, every year. And the erosion, they say that part that's eroded belongs to the government now. And if he comes back with his dirt and puts it in, that's fine, but he's trespassing on government land. So if I'm right in reading that, if I'm right, I'm a big if, it seems that 11 cases somewhat stand for this, I agree, somewhat arbitrary rule. Now, so I'm tempted, if I'm right, to say, okay, it's not perfect, but let's go with it. There are people all over the country who have probably relied on this stuff. And that would be so absent. A better rule. So what do you suggest would be a better, clearer rule for compensating for flooding where our problem is what's a trespass and what's a taking? And, Your Honor, I know it cannot be the Federal Circuit's rule that you can never have temporary flooding as a taking. And I guess I would just like to know what your idea – I understand the difficulties with there, and I'm willing to accept a lot you mention, but what I'm asking, which I just did ask, is what's your idea of a substitute that would be better? Your Honor, the substitute would be to remain consistent with how this Court analyzes the physical takings, not use anything from regulatory analysis here, but looking at these elements. And the Corps of Engineers will need, when they know that it's predictable, that it is foreseeable, as the Court below found, that their actions will place water for storage on land that they know they can purchase flood easements for. And what's the condemnation? So a Department of the Interior employee trespasses on Jones Lane, trampling paths, and even limbs fall off trees. That's a taking and not a trespass. No, Your Honor, it's not. Because? And because the Court said in the Kress case, it's the character of the government's action, not the amount of damages resulting from it, so long as that is substantial. And in the cases, the Court has looked at what is substantial intrusion. In Loretto, the Court said a permanent physical occupation on a rooftop in Ms. Loretto's building, small area, that is substantial, even though geographically it was very small, because it cut through these valuable property rights to occupy someone's property. And so substantial may not have to be very high. Breyer, so our department employee, trying to find a shortcut, drives his bulldozer through Jones' land, knocking down his favorite Redwood. Is it a taking? Your Honor, I think we would, again, use the analysis, separate out the torts, where the action is direct, it's been predictable what that would result in, the United States should know that, and then the intrusion or interference with those property rights is substantial, there will be a taking. Usually that's not going to be the case in a one-time situation, as you're hypothetical. And again, here the Court heard six consecutive years of this invasion of water. The commission couldn't turn it away. And our cases treat physical occupations differently from other cases, don't they? And the park ranger walking through can hardly be called a physical occupation. He's harmed the land, but it's not a physical occupation. What you're arguing here is that flooding the land is a physical occupation for the period that it's flooded. It is, Your Honor. Where it's an occupation, it's certainly clearer and more intrusive. There can be invasions that don't amount to an occupation. Well, you say, here's what troubles me, you say it has to be substantial. But you can't can we can we fold into that word substantial a requirement that it have caused substantial financial loss? See, if that were the case, then I could distinguish your case where a lot of valuable trees got destroyed. Certainly, Your Honor, substantial. And I wouldn't say every, you know, every flood that goes across a land, even two years or three years in a row, would not necessarily be a taking. You could look at the economic part. Yes, definitely, Your Honor. What is substantial is going to be made as a legal determination by the court as a matter of degree. And you can look at the extent of the damages. If there's destruction of property, destruction has been, as in the Kansas City life case in 1950, the taking is to the extent of the destruction. Beyond that, though, it's looking at interference with use of the point of interest. What was the Kansas City case that you're appealing to? I don't remember. The Kansas City life insurance case in 1950, Your Honor, was underflow invasion of water percolating up on property in Missouri from the Mississippi River. And that was found to be a substantial invasion where the property, the 1,700 acres was taken by the United States. And the court there said when you destroy the use of that property for what it was being used by the landowner, you owe to the extent of the destruction that you have caused. Mr. Goodhart, maybe you would help to know what you think, if we accept your position, would be left over for the Federal Circuit to consider on remand. You haven't asked to, for an outright reversal and have the decision of the court to have Federal claims be the end of the matter. So if we accept your position, then what issues would be open for the Federal Circuit to resolve on remand? Your Honor, and if I may, after I answer your question, if I would like to reserve the remainder of my time. Your Honor, I wish we could have asked for affirmance. We — there are several other issues that the Federal Circuit did not disturb or address. They did not go into the facts of — on appeal that the United States has. So the question is, what do we say to the circuit? What do you want us to tell the circuit to do on remand? We want the remand to say apply the rule of law here for physical taking and look at it as the court of Federal claims did. Was there a direct physical injury? Did it result in substantial intrusion on the commission's property? If so, the just compensation clause is self-actuating and there should be just compensation. But what were the other issues that you just mentioned? You said we couldn't ask for an automatic affirmance. The United States raised several issues and the commission cross-appealed on asking for regeneration damages, Your Honor, and those would need to be addressed on the remand. Thank you. Roberts Thank you, counsel. Mr. Kneedler. Kneedler, Mr. Chief Justice, and may it please the Court. As has been pointed out, this Court has consistently held in its flooding cases and reaffirmed in Loretto that a taking occurs in the context of flooding only if the flooding is the direct result of the structure itself and if it results in a permanent effect on the property such that it's an actual appropriation. This would be the case. Roberts There's a little confusion about the government's position, as there was in the court of appeals. Is it, I'm quoting from your friend's brief, and he says the Federal Circuit adopted a categorical rule that temporary government action can never be a taking if the government does not intend to create a permanent flooding condition. Is that an accurate statement of your understanding? Kneedler I think the intent point, I guess I would modify that. There are some things that I think it would have to be an objective standard. In Dickinson, for example, the modification was intrinsically permanent. The landowner had corrected for it, but it was intrinsically permanent until the landowner had done something about it. So actually Dickinson is consistent with our position. But I do want to — there's a critical piece about this case that Justice Kennedy's questions have touched upon that I think it's very important for this Court to focus upon. This case is not about flooding by the project itself, the reservoir behind the dam, the easements, the flowing easements there, the spillway. The project is the government, and I think it's fair to say the government is occupying the land when the government builds the project. What we have here are incidental consequences downstream from the dam as a result of the flowage. And there are — Loretto, when it is summing up this Court's flooding cases, makes two points. One, it says it has to be permanent, not temporary invasion, but it also distinguishes the category of cases in which there's conduct outside the landowner's property that has consequential damage. Scalia I don't understand what you're saying. Are you saying that if this landowner owned land behind the dam that was temporarily flooded, as often as has happened here, that that would be a taking? No, I didn't think you're saying that. Kneedler No, but what I'm saying is this would be a particularly bad or problematic context for the Court to depart from that. Roberts Well, but there are pretty clear findings in the court of claims on the question of causation, right? I don't think it's a question of causation. And if I could just point out that two cases, one of which was cited in Loretto in its summing up of this Court's flooding cases, is Bedford. Bedford was a situation in which a revetment, as counsel pointed out, a revetment was constructed in the Mississippi River to protect erosion and access to the city of Vicksburg. It was clearly shown in that case that over time, over a period of 6 years, as in this case, downstream by 6 miles, it resulted in permanent flooding of land as a consequence of that. But what the Court said is that is consequential injury downstream. It is not occupation by the government. Roberts So if the government comes in and tells a landowner downstream that every March and April we are going to flood your property so that you can't use it from now on, that's the way, that's part of our plan. That's a taking for those two months, correct? Bedford No. I don't think it's a taking. Roberts No. The government says you will not be able to use your land because of what we are doing for two months. You have been able to up to now, but from now on, for March and April, you can't. That's not a taking? Bedford I don't, and let me explain why. What we are talking about here is the Corps of Engineers operating a dam from which it has to take into account multiple considerations. In this case, there was marina operators, there were farmers along the river, there were drainage districts. Roberts I'll grant you that it can decide whose land it wants to take. I just want to know why that's not a taking. Bedford Because this is a classic example of the government adjusting benefits and burdens. This is why the Federal government was invited in to construct these projects, because along the river there was very serious flooding. So the government puts in a dam to control the flooding. It has to release the floodwaters. And the timing of the release of the floodwaters is something that you have to take into account outside. Roberts So if the government says we've got to release the floodwaters, and what we are going to do is we are going to have water trucks pull up behind the dam, we are going to load them up, and we are going to drive them downriver to this person's property and we are going to dump the water there. Bedford The government itself is actually putting the water, I think that's very close to being the reservoir behind the dam. But typically when the government, I mean, I think uniformly when the government is operating the dam. Roberts Your answer is that would be a taking. Bedford I think because it would be specifically deposited on that landowner's land. It would be the same as if they put a pipe from the dam to that person's land. But that's not what's happening when the government is operating a dam. It is operating it with consequences for the basin. It's not aimed at any particular landowner. Roberts Again, I think the court of claims' findings are to the contrary. They said the government knew that this water was going to go right here, right? Bedford Well, it was not targeted. There is no suggestion that it was targeted at this land, which is, I think, something quite different. This was an incidental consequence of what was happening downstream. Again, in the Bedford case, you had permanent consequences. Scalia A foreseeable and certain incidental consequence. Bedford No, I don't believe foreseeable is enough. It could have been foreseeable in Bedford. Let me take a more dramatic example that I think illustrates this point. This Court's decision in Sponenbarger, which we cite in our brief, that case discusses a prior holding by this Court in a case called Jackson, which was a situation where a levee, government built a levee on one side of the river, which had the effect of flooding property on the opposite side of the river, because it kept it from going to this side and channeled it in the river, and it caused it to overflow the land on the other side. And the Court said that is not a taking. Roberts What if the government decides for purposes of flood control, I don't know the ecological way, but the water has to percolate or whatever down this area, so it goes on to this person's land and it cuts down $5 million worth of his trees? For the same purpose, to assist in flood control. No doubt that that's a taking, right? Roberts I think that would be, unless there's some emergency justification. Roberts Sure, sure. And so the government then comes down and says, we're going to flood your land, and we know, again looking at the factual findings, we know that will result in your trees dying. But because we're doing it for flood control, that's just too bad. Different case when they go in with a chainsaw than when they go in with the water. Kneedler Yes. When they go in with a chainsaw, the government is actually going on the property and the government is, to use counsel's term, directly cutting down the trees. I think it's very hard to explain consequences 110 miles downstream as being direct. It's — and there's no case that Petitioner has pointed to with that sort of incidental consequence. Breyer What is the legal rubric? I mean, what you're trying — what I haven't thought of until you've been putting it this way is that the government builds a dam. When it does it, water backs up behind the dam, and that water might flood somebody's land. That's a taking, if it's at least permanent and so forth. Okay. Now, the government builds a dam, all that happens. Because the government builds a dam, a lot of other things happen. They release water sometimes. They make electricity sometimes. Different animals come in. All kinds of things can happen to different people 200 yards down. Some will be 200 miles down. Some will be helpful. Some will be hurtful. Can they never bring a lawsuit? Can they sometimes recover? How do we look at that? Kneedler I think under this Court's takings, decisions, and specifically those dealing with effects caused by something outside the property, I think it is basically a per se rule. Breyer Well, then suppose what the government said is, Mr. Smith, you live 150 miles from here, and we have a rule, and our rule is you can't cut down any of your trees, and you can't farm the land, and you can't even walk on it without a boat. All right. That would be at least a regulatory taking. Kneedler Well, it would be analyzed. Breyer So why — now, they're doing exactly the same thing here, but instead of a regulation, they send some water in to do it. So should we analyze it as a regulatory taking? Kneedler It has certain parallels in that respect in the sense that the government has to make a choice. It's constructed the dam, and its releases are going to help someone and hurt someone. It can't be put in a position where it's going to have to pay compensation every time it chooses one thing or another. There's another point I'd like to make. Sotomayor Well, but that's the issue. Sotomayor Is Dickinson decided wrong under your theory? They built a dam, it raised the water level and flooded the Petitioner's land, and the Court gave recompense. Kneedler Yes. And — Sotomayor But you just said two minutes ago, or I thought I heard you say, that when the government builds a dam, even if it floods some people and not others, that there's no taking. Kneedler I'm talking about downstream, not the reservoir. And after it goes — after it goes through — Sotomayor The baseline — tell me what the baseline is, and perhaps you can answer Justice Kennedy's question more directly. Anything in the reservoir is a taking, anything downstream is never a taking. Kneedler Well, assuming it's permanent in the reservoir, which it's likely to be, when the government is constructing it, it — Scalia Well, no, not necessarily. Suppose there — because of a spring melt-off or other factors, it's clear that the months of the year will be more extensive than it will the rest of the year. Kneedler Right. Scalia So you could say, Justice, here, that there's only been a temporary taking of some of the land behind the reservoir. Now, doesn't the government condemn all the land, even that which would be only temporarily flooded? Kneedler But that is covered by this Court's decision in Kress, in which the Court said that if you have a situation where property is permanently liable to inevitably recurring flooding, that that's the same thing as a permanent — even though sometimes it's not covered, it is permanently liable. Kennedy And the only difference in that formulation and this case is that it was for 7 years and not permanent? Is that true? Kneedler Well, insofar as we're looking at the temporary aspect of it, it wasn't 7 years. It was a series of individual determinations made by the Corps, but for reasons that tie into the downstream effects. It was releasing water from the dam and was making a series of administrative decisions about how to operate the dam. It has a water control manual. Downstream landowners are protected not by retroactive award of damages under the Just Compensation Clause, but by public participation requirements. Sotomayor I must be slow today, because I'm having significant problem with your articulation of your test. Basically, you're saying once a dam is built, no downstream owner has a claim, or you're building an exception from when the claim can be applied to a downstream owner? Kneedler I think under this Court's current precedents, there would be no claim downstream. Sotomayor It doesn't matter whether it's permanent, reoccurring. Kneedler Foreseeable. Sotomayor Foreseeable or anything else. Jackson, Sponenbarger, the revetment case, Bedford, were all cases where it was permanent. If I could mention one other point. Roberts But just before you get off the case, I think part of the confusion, at least for me, is the difference between what the Federal Circuit decided and what you're arguing. You seem to be arguing that it doesn't make any difference. It's not whether it's temporary or permanent, right? The Federal Circuit thought it was dispositive that this they viewed as temporary and not permanent. So it seems to me that you're fighting, and you're fighting a lot of the court-acclaimed very exhaustive findings to present a different argument. It seems to me that if we disagree and we think it makes a difference, that it doesn't have to be 50 years, but it might be something less, then maybe you've preserved all these other arguments or maybe not. But I think it's we have argued both below and here that this is consequential and that it's downstream and we have those effects. We agree with the Federal Circuit. We are not disagreeing with that conclusion, because this is, these were temporary series of individual temporary decisions made for their own reasons. But when you add it to the Federal Circuit, but then you're presenting all these other arguments in which it doesn't depend. So if we disagree with the Federal Circuit, it seems to me that we ought to say that. And maybe you can make these other arguments about it's too far downstream or. But I think in deciding what's temporary, you shouldn't divorce it from context. And here the context is the consequence is downstream. This is not, I mean, if you were to depart from the court's rule up until this point about permanence, and there has to be something less than permanent will do, I don't think you should ignore the fact that the consequences are not the sort of direct governmental occupation of the land like at the reservoir, but the sort of consequences downstream that affect, that can affect a whole range of people. And I would like to make one very important point about context, and that is in 1928, after the Great Mississippi Flood of 1927, Congress first got into the flood control business in a massive way. But it was unwilling to do that if it was going to be held liable for consequential damages from floodwaters downstream. It therefore included section 702C in the Flood Control Act of 1928, which says that the government shall not be liable for any damage to any property at any place resulting from floods or floodwaters. Scalia. Of course, that can't overrule the Takings Clause, can it? I think what it does. I mean, that's nice that Congress doesn't want to be liable. But Congress no, it's the point is more fundamental than that. Congress recognized, and the legislative history shows this, that Congress recognized that under this Court's precedents, there would not be takings liability. The Bedford decision is in fact cited in that. This Court pointed out in its James decision, which recounts the history of that, that there was a proposal to make the government responsible under the flood control projects for any taking or any damage to property. And this Court said that went way beyond anything the Fifth Amendment would require, and it was cut back. And Congress said it's not going to be liable for any damage. And I think that shows a very important reliance interest on the part of Congress with respect to the line that this Court has drawn. Congress was not going to be liable for any damage. Ginsburg, what was wrong with Judge Newman's position on this temporary versus permanent? It said, she said that temporary versus permanent, the target should not be the government's action, but the effect of that action, that is, if trees are killed and they won't revive. The damage is permanent. That's where we should look, not whether the government is going to do this year after year. I don't believe that that's correct. I mean, that would turn on the happenstance of what a particular landowner had on his property downstream. And I think the government, in operating the general project, cannot be held to do an investigation of every property owner. Again, it's releasing water generally. And if we, maybe if I could use the levy example here, the release changes that were made here were made to protect farmers so that they could plant more crops and not be protected during their harvesting. If you shift back to what the core, to the core's regular operating scheme, it affects the farmers. It might be a flood. Scalia. I mean, the issue is who is going to pay for that wonderful benefit to these farmers. Should it be everybody so that the government pays and all of us pay through taxes? Or should it be this particular sorry landowner who happens to lose all his trees? It doesn't seem to me particularly fair. It is in the nature of living along a river. Riparian ownership carries with it certain risks and uncertainties from weather, from intervening causes. The government is — there are a thousand square miles, more square miles of drainage area below the river. One of those risks has to be the government is going to make you pay for protecting somebody else. Is that one of the risks? Well, when picking up on what I said about Congress, Congress would not have gotten into the flood control business without this protection of liability. People would live in it. Oh, I doubt that. Well, this Court in James said it was an important condition for Congress getting into it, that it was not — Congress was not going to be held liable for the damages downstream. That came to be the basis, the baseline of expectations for people downstream from a — from a poor area. Or upstream under your theory. Well, if it's — if it — but the construction of the project itself and the flooding of the reservoir, the government condemns that land, purchases that land. It recognizes that. Well, the hypothetical is suppose it doesn't. Suppose that there's some land that's up — that's fairly far upstream from the main reservoir, but it's flooded once every other year. Well, the question would be whether it falls within the crest test of whether it is permanently liable. But your position seems to be that if it's downstream, somehow it's not the government. There's a series of administrative actions and it's not really the government's water. It's like the old moral refuge that the rocket designers take. You know, I make the rockets go up where they come down. It's not my concern. It was basically — I mean, it was the rationale of this Court's cases in Bedford, in Sponenbarger, and reaffirmed by this Court in Loretto, a modern takings case dealing with the question of physical occupation. And the Court said that the — and it made two points. Again, it said it made the temporary versus permanent point, but it also made the point about conduct outside the land that has an effect inside the land. This case has both of those features. You have a series of temporary decisions that you could, in building a government project, let's call it, say, an electricity plant, or high-tension wires, you could require the taking of some land to build it. Now you've got that and you begin to run it. You could run it in such a way that it takes some other property. I mean, the electricity could, for example, because of some odd thing, run around and take over somebody's land and kill all the chickens. That wasn't expected, but it happened. And it happened because of the way the government runs the plant. Now, I guess there would be a taking in such circumstance if, in fact, because of the way it's run, it makes that land, which no one thought would happen, as a consequence of the project, uninhabitable. Wouldn't there be? Well, again, it depends. I mean, if the government is occupying the land when it happens, yes. But there's a — as you've, I think, pointed out, there's a critical difference between a toward and a taking. And there can be collateral consequences of what the government does that cause interest. A collateral consequence is to make some piece of land 4 miles away, quite unexpectedly, but totally uninhabitable. Now, what's supposed to happen there? That's not just a trespass, because it's permanent. And even if it's once every 2 years, it's permanently once every 2 years. But I think it would depend on whether — and there was a case, I believe it's the Baltimore and Ohio Railroad. What's it say? It says if the — had to do with releasing smoke from a train. And the Court said just releasing it into the air. Yeah, but they made this distinction. But if you focus it on someone. Yes. If it's — if you pipe it to the person's property, that's a — that may be a different matter. All right. So, well, that's the point. The reason they don't compensate there is it apparently had something to do with everybody suffering the cinders. But where the cinders went out of the train and they ended up on just one person's property because there was some pipes or something, then it was a taking. It was focused. And that's not true in the operation of a dam. Well, here they're focusing it on his land. They're not focusing it on his land. His land is — first of all, the Commission's land has always been subject to flooding. And as we pointed out in our brief, even under Petitioner's analysis, it results in an incremental flooding of 5, 4, 3 or 4 days. Not flooding that time of year. That's the problem. I mean, that's flooding at a time when it wouldn't harm the trees. But it is land in a floodplain that would be suitable for any sort of construction or development. It is land in a floodplain. And they have not argued, in fact, their appraiser in this case acknowledged that there is no permanent decrease in the valuation of the land. They are arguing only about trees. And that is — that seems classic consequential tort-type damages, that floodwaters in — we'll assume in somewhat greater increments went on the land and damaged trees. They didn't damage the land. In fact, the Commission — there was still hunting on the land during this — during this period. Roberts, that strikes me that that's a valuation question. But I understood you to say that if there was a pipe coming out of the dam and it went to somebody's — right to the property line of somebody's land and that's where you dump the water, that would be a taking. Yes. Okay. Because I thought the factual findings in the trial court said that was this case, that you knew when you opened up the dam that this is where the water was going to go. First of all, the Court — the Court did not say that the government knew. In fact, it said the government was unaware, and this discussion is between 95a and 99a in the Court of Federal Claims' decision, that the government was unaware in 1993. What about 6 years later, when it was doing the same thing and the water went to somebody's land and the water went to the same place? The taking goes — the taking claim here goes from 1993 to 1998. The Court of Federal Claims said even as of 19 — at least until 1996, it was generally assumed that the operations of the dam did not have a significant impact below the Missouri-Arkansas line. I mean, again, this is 110 miles downstream. This was in no way focused on the — on the commission's land. Alitoso, are you saying there's a difference between the situation where the government particularly wants the water to go to a — to a place and the situation where the government knows that's where it's going to go but doesn't particularly care where it's going to go? Well, I think there's a — I don't know about the — the intent. I mean, in the hypothetical with the Chief Justice, the government was actually transmitting the water. It was essentially using the land as — as a reservoir, and that — that's, I think, what Petitioner's counsel was trying to conjure up by saying the government was using this land for storage. The government was not using this land for storage. The government — this wasn't the government's water. There weren't any outtakes from the commission's land to use this water. These were floodwaters, which, again, the Flood Control Act says the government is not liable for release of floodwaters from a project. That ended up on — on the land. That is an incidental consequence of the operation of a flood control project. People who live in a basin where there is a flood control project get enormous benefits in the control of that. The water has to be released, and it has long been the case that the way that problem is — that issue is handled about how it will be released is by ordinary administrative law principles, basically, with a core in operating the dam. They have requirements of public participation. In this case, the commission participated on ad hoc planning groups. This manual had not been updated in 50 years. Core regulations say that manuals should be updated to keep a pace of changing circumstances, population changes, different uses, environmental concerns. So when that happens, the commission acted responsibly here and had it — Scalia. You would say that even if this land was permanently flooded, okay, permanently flooded, so he couldn't use it at all, since it was downstream, no harm done. Right? Kneedler. I think that's the consequence of this. But there's no — the Court doesn't have to decide that here, because this is — Scalia. But that's your position. Kneedler. That's — I think the necessary consequence of this Court's holdings in Bedford — in Bedford and related cases. And it may have harshness in some circumstances, but, again, when you live on a river and when you know the consequences of having a flood control project on the river, that's what happens. But this is not arbitrary. There is this planning process. There is notice and comment. There is NEPA. Roberts. Roberts. There is notice and comment. So the choice is there are 10 landowners downstream. The question is which one you're going to flood. And you flood number two, and there's a public process in which number one and three through 10 get to say, yeah, this sounds fine to me. Kneedler. No, that's not — that's not what happens. What the Corps was working for here, it's commendable. The Corps was trying to develop a consensus of downstream water users, which is why it convened this ad hoc working group. The commission, drainage districts, representatives of farmers, the marina, the Corps of Engineers, getting everybody together to try to come up with a way to handle the problem. And if — Sotomayor But what difference does that make? It's nice that you try to reach consensus. If number two is not going to be part of the consensus because he's the one always affected, you're saying permanency, repetition, nothing counts. He just loses. Kneedler No, he doesn't lose because he has an action under the Administrative Procedure Act. He's not — the Corps is required to take into account various factors, including specifically the impact on other people in the basin when it's making a decision. If the Corps — Scalia But he loses because the Corps comes in and says, yeah, indeed, we did flood two, but in order to save, you know, one and three through 10, right? And he'd lose. Kneedler Well, the Corps cannot be arbitrary in doing that, but the — Scalia Okay, it's not arbitrary. Kneedler But the Corps requires a broad ambit of discretion in managing a river over time. And it has to be able to change, to update circumstances without exposing the United States to massive liability. Ginsburg Mr. Kneedler, does your essential argument turn on this being indirect, as you say? This is consequential. Therefore, it isn't — it doesn't belong in the takings category. Anything that's consequential rather than direct. Kneedler We have two submissions. I mean, it's the confluence of both factors mentioned in Loretto. There — and the Court doesn't have to decide anything broader than that. It's the temporary nature of the decisions. These were individual decisions made often with the recommendation or concurrence of the ad hoc committee. So it's temporary in nature, self-limiting, as everyone knew, as part of this ongoing planning process, but also particularly in this case, where it has only consequential effects downstream, which is, again, the way the Court, including in Lina, one of the leading cases, the Court says that this is consequential. Alito Why should it make a difference whether the Court — the Corps has a plan which says we're going to release this water every summer in a situation where year after year after year somebody makes an ad hoc decision in the summer that we're going to release the water? Kneedler I don't think analytically, for the reasons I said about the downstream, but to the extent the Court is focusing on temporary, these were self-limiting and there was no guarantee they were going to be renewed. And, in fact, at the end of this process, the Court decided — or the Corps decided not to adopt a permanent change after going through the NEPA process. Roberts Thank you, Mr. Kneedler. Mr. Goodhart, you have four minutes remaining. Goodhart Thank you. As my friend has said about these damages being consequential and just affecting trees and not the land, the Court did not find that this was just consequential downstream damage, that this was direct, natural, and probable from these releases that the Commission had protested and complained about for years, that that's in the record, that they knew that they were using this land to store this water, and the Commission could not get their attention to stop it until our director — it was on Valentine's Day in 2001 — brought the appraisal to the Corps of Engineers' office, a whole roomful of people from both sides, and placed that report from — from 2000 that said over $4 million worth of valuable timber is gone. Please stop. We were — we were pleading. So they knew, and I think the Court of Federal Claims found that they — they had the understanding that they were using this to accommodate the farmers who were using marginally low property that the U.S. Fish and Wildlife Service says in the record probably shouldn't have been cleared anyway, but they were wanting to provide and adjust the benefits for those landowners and use the Commission's property to store the water. And, Your Honor, I don't know, Justice Kennedy, where the line should be drawn, but the cases of Sponenbarger and Bedford and Sanguinetti say that when it's not the United States structure or it's not the policy, and the landowner cannot show that, that it's from storms or from something in nature, that's not going to incur liability. Even negligence may not incur liability unless it's direct, that what — how it caused, and then substantial intrusion. And, Your Honor, I think the — Sotomayor, is the baseline — and we'll go back to Justice Kennedy's question — is it before the dam or after the dam, and why is it one or the other? If flooding was going to occur more unpredictably before the dam and possibly summer flooding of this kind could have happened, do you lose? Your Honor, under that — under those facts, if it could have happened and the landowner knew that, and that that is a cause, not the United States — if the United States takes away its flood protection and this land goes back to what it would be naturally, then the landowner can't prove that it's direct from the United States. The landowner would not recover in that instance. In this situation, the evidence — Even though after the dam and the dam's plan was to ensure that it didn't happen, you would still lose? If natural conditions have possibly caused this, you would lose. If it's not superinduced invasions directly from the United States, the landowner is going to have that as a natural condition. Here, that was certainly not the case. Summertime flooding of this type never happened in the recorded history. Pre-dam. In the recorded history. In the pre-dam or during the first 40 years of how this was operated. It was when it was adjusted that the United States used this land and then took the valuable timber. I'm not sure that's not open to dispute. There's some argument here that rainfall that was naturally occurring contributed to what was happening to the trees. And I think that there is — at least that's what I understood some of the factual argument. No, Your Honor. I think the record is clear that this was directed naturally, probably, without the — without the interference or addition from nature. Thank you. Thank you, counsel. Counsel, the case is submitted.